UNITED STATES DISTRICT COURT
IN AND FOR THE WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

U. S. DISTRICT COURT
WESTERN DISTRICT ARKANSAS
FILED

OCT 1 8 2012

Chris R. JOHNSON, CLERK

BY

DEPUTY CLERK

Theresa Roeder, as the Administratrix of the
Estate of Esther Kay Roeder, deceased, and on
behalf of the wrongful death beneficiaries of
Esther Kay Roeder; Tara Roeder, as the
Administratrix of the Estate of Bruce Wayne
Roeder, and on behalf of the wrongful death
beneficiaries of Bruce Wayne Roeder; and Tara
Roeder, Administratrix of the Estate of Deborah
Busby Roeder, and on behalf of the wrongful
death beneficiaries of Deborah Busby Roeder,
        Plaintiffs,

CASE NO.:   12-6120

v.

United States of America,
        Defendant.
_____/

## COMPLAINT

Come now the Plaintiffs, Theresa Roeder, as the Administratrix of the Estate of Esther

Kay Roeder ("Kay Roeder"), deceased and on behalf of the wrongful death beneficiaries of Kay

Roeder; Tara Roeder, as the Administratrix of the Estate of Bruce Wayne Roeder ("Bruce

Roeder"), deceased, and on behalf of the wrongful death beneficiaries of Bruce Roeder; and Tara

Roeder, Administratrix of the Estate of Deborah Busby Roeder ("Deborah Roeder"), deceased,

and on behalf of the wrongful death beneficiaries of Deborah Roeder (hereinafter the

"Plaintiffs"), by and through their undersigned attorneys, Wilkes & McHugh, P.A., and for their

cause of action against Defendant, United States of America ("United States"), state:

### INTRODUCTION

1.      This is an action brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§

1346(b)(1), 2671 et seq., Arkansas Survival of Actions Statute, Ark. Code Ann. § 16-62-101, and

the Arkansas Wrongful Death Act, Ark. Code Ann. § 16-62-102, for personal injury and wrongful death caused by the negligence of the United States Forest Service.

2.      In addition, this is an action brought pursuant to 42 U.S.C. sections 1983 and 1988, under the Fourteenth Amendment to the United States Constitution.

3.      The Plaintiffs request a jury trial, pursuant to Rule 38(b) of the Rules of Civil Procedure.

### JURISDICTION

4.      The action alleged herein against the Defendant, United States of America, arises under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671 et. seq., and therefore this Court has original jurisdiction under 28 U.S.C. § 1331.

5.      Additionally, the Court has jurisdiction of this action pursuant to 42 U.S.C. section 1983 and 28 U.S.C. section 1331.

6.      Venue is proper in the Western District of Arkansas under 28 U.S.C. § 1402 because this is a civil action involving claims against the United States, and the acts and omissions complained of occurred in this judicial district.  Venue also is proper under 28 U.S.C. § 1391(b).

7.      All procedural prerequisites to filing this action have been satisfied, met, or otherwise waived, including the exhaustion of all administrative remedies under the FTCA.

8.      Originally, on or about October 26, 2010, Plaintiffs submitted their claims for damage, injury and death to the United States Forest Service (hereinafter "Forest Service"). Pursuant to agreement with the Defendant, the Plaintiffs resubmitted their administrative claims under the FTCA on or about March 5, 2012.

9.      Pursuant to 28 U.S.C. § 2675(a), no response has been received as of the date of filing this Complaint and the administrative claims may be considered denied for the purpose of filing this pleading.

### PARTIES

10.      Theresa Roeder is a resident and citizen of the State of Louisiana. She is the daughter of the decedent Kay Roeder, who died as a result of the negligence that gives rise to this action. *See* Death Certificate attached hereto as Exhibit "A".  She was duly appointed as the Administratrix of the Estate of Kay Roeder on January 11, 2011, as evidenced by the Letters of Succession attached hereto as Exhibit "**B**".

11.      At all times material hereto, Kay Roeder was lawfully married to and resided with Noel "Tom" Roeder. Kay Roeder died in a flood at Albert Pike Recreation Area (hereinafter "APRA") on June 11, 2010 at 69 years of age. She died with three children, Theresa Roeder, Cindy Kinler Tuma, and Keith Roeder, and two siblings, Edwin Park and Connie Gardner.

12.      Tara Roeder is a resident and citizen of the State of Louisiana. She is the daughter of decedents, Deborah Roeder and Bruce Roeder, both of whom who died as a result of the negligence that gives rise to this action. See Death Certificates attached hereto as Exhibit "**C**" and "**D**". She was duly appointed as the Administratrix of the Estates of both Deborah Roeder and Bruce Roeder on July 11, 2011, as evidenced by the Letters of Independent Administration attached hereto as Exhibit "**E**".

13.      At all times material hereto, Bruce Roeder and Deborah Roeder were lawfully married and resided together.

14.      Bruce Roeder died on June 11, 2010 in a flood at APRA at 51 years of age.  Bruce Roeder died with two children, Tara Roeder and Brian Roeder, a half-sister, Cindy Kinler Tuma,

a half-brother, Shane Carpenter, and two parents, Noel "Tom" Roeder, and Darlene Wright Roeder Carpenter.

15.     Deborah Roeder died on June 11, 2010 in a flood at APRA at 52 years of age. Deborah Busby Roeder died with two children, Tara Roeder and Brian Roeder, two brothers, Daryl Busby and Henry Busby, and two parents, Minor Busby and Ruth Busby.

16.     The United States is a sovereign government that has consented to be sued for civil liability in accordance with the FTCA, 28 U.S.C. § 2671, et seq.

17.     Plaintiffs are informed and believe that at all times material hereto that the Forest Service was an agency of the defendant, United States, under the direct jurisdiction of the United States Department of Agriculture (hereinafter "USDA").

18.     Additionally, at all times referred to herein, the Defendant, its agencies, employees and agents, whether named or unnamed herein, were acting under color of state law, statutes, ordinances, regulations, policies, customs, practices and usages of the United States of America, pursuant to their authority thereunder.

19.     The Ouachita National Forest is part of the 193 million acres of public land managed by the Forest Service, an agency of the USDA.

20.     The Ouachita National Forest covers 1.8 million acres in the central west region of Arkansas and southeastern Oklahoma.  The APRA is a designated, recreational area for use by the public, within the southern portion of the Ouachita National Forest in southern Montgomery County and about 6 miles north of Langley, Arkansas.

### BACKGROUND FACTS REGARDING THE JUNE 11, 2010 FLOOD

21.     On June 10 and 11, 2010, the National Weather Service issued storm warnings, a flood watch, a flood warning, associated with a storm heading towards the APRA.  In the two

days leading up to June 10 and 11, 2010, the same weather system had sparked heavy thunderstorms as it slowly trekked northeastward through Texas and into Arkansas, with associated flooding along rivers and in areas to the southwest of the APRA.

22.   A day prior to the storm reaching the APRA, on or about June 9, 2010, members of the Roeder Family gathered at the Recreation Area for their annual summer vacation, as they had for many years. While some of the family members set up in tents, Kay Roeder, Bruce Roeder, his wife Deborah Roeder, and their daughter Tara Roeder, paid the fee required to set up and use their 2007 Keystone Sprinter travel trailer in one of the sites in Loop D area specifically designated for recreational vehicles (hereinafter "RV") use.

23.   The next day, unbeknownst to the Roeders who were enjoying their RV vacation at Loop D, the storm system made its way closer to the APRA, producing two rounds of storms in the morning and afternoon.  In the early morning hours of June 11, 2010, the storm began to cause flooding along the Little Missouri River in the vicinity of the APRA.

24.   The Defendant, and its agents and employees working in and monitoring the APRA and the Ouachita National Forest were aware of the storm and flash-flood watches and flood warnings issued for that area during the day and evening.  Despite their knowledge of the flood-prone nature of Loop D, the employees and agents of the Forest Service made no attempt whatsoever to warn the Roeders or any other RV user in Loop D of the dangerous situation they were in and of the flood-prone nature of the Little Missouri River that bordered the RV Park.

25.   In the early morning hours of June 11, 2010, while the Roeders were inside sleeping in what they believed to be the relative safety of an RV situated in a facility designated for that use by the Defendant, the Little Missouri River silently began to flood and overrun its banks into the Loop D site.

26.    Tara Roeder was the first to be awoken inside the Roeder RV around 3 a.m. because it was rocking.  She roused her parents and grandmother, and they had just enough time to look outside to try to see what was happening in the dark outside, when water began streaming through the door of their RV.  Within seconds, something – possibly a vehicle – slammed into the side of the Roeder RV.  It started floating and began to roll over.  The Roeders tried to walk up the inside wall of the RV to right it, but it was no use.  There was another powerful impact, and the insides of the RV and its contents imploded.  All four Roeders – Kay, Bruce, Debbie and Tara, were pulled into the roiling, violent flood and pouring rain during the pitch black of early morning.

27.    Once their RV disintegrated and she was thrown into the flood waters, Tara Roeder never saw or heard from her parents and grandmother again.  She was buffeted by the rapidly moving water, and with effort now devoted to keeping her head above the rapids and saving her life, Tara grabbed at passing trees.  She finally was able to cling to a tree small enough that she could wrap her arms and legs around as the water rushed her from behind, while objects and debris lifted by the water bashed into and cut her.  For more than two hours, Tara held onto the tree for dear life.  Around 6 a.m., the flood waters calmed and receded sufficiently that Tara was able to climb down and wade to a spot of ground where she waited with others to be rescued.

28.    Prior to their deaths from being battered and drowned in the violent flood waters, Kay Roeder, Bruce Roeder and Deborah Roeder experienced the pain and distress of being helplessly swept down river while being bashed, cut and bruised by debris and trees.  Kay Roeder, Bruce Roeder and Deborah Roeder also experienced the nearly unquantifiable and extreme fear, terror, anguish or distress of knowing they were about to die by drowning in their

own RV or in the violent floodwater that tore it to pieces.  This was an unfathomable and unforeseeable fate to have imagined less than two days prior, when the Roeders arrived at the APRA to enjoy the pleasures and relaxation of a family vacation in their RV.

29.     The flood waters cut off any means of escape and prevented rescue of many others.  Vehicles in Loop D parking areas were unable to navigate the high water and were swept away.  The 8 RV sites were destroyed, as well as the concrete pads, asphalt roads and parking lot and other facilities and structures in Loop D.

30.     The June 11, 2010 flood swept away much of the APRA, including the register of users at the site, so it was not known exactly how many people were in the park at the time, though estimates put the number between 200-300.

31.     In the days after the flood, airplanes and helicopters, including a Black Hawk dispatched by the Arkansas Air National Guard, made low passes through the rugged and steep mountain valleys in search of victims.  Hundreds of volunteer searchers, including 12 K-9 units, members of the Arkansas Canoe Club, and divers from the Murfreesboro Dive Team, combed 50 miles of river and tributaries searching for victims and, subsequently, locating and recovering the bodies of the dead.

32.     Approximately 60 people were rescued.  In the end, it was determined that twenty were killed by the flood that night, including Kay Roeder, Deborah Roeder and Bruce Roeder.

**BACKGROUND FACTS REGARDING DEVELOPMENT OF LOOP "D"**

33.     The APRA is adjacent to the Little Missouri River, and is comprised of four separate loops or areas known as Loops A, B, C, and D.  Loops A and B are located on the west side of the Little Missouri River, downstream from Loops C and D.  Activities at the APRA

7

include swimming, canoeing, fishing, hiking, camping and facilities for the use of RVs in designated areas.

34.    In 2000, the Forest Service began making plans to develop the area of the APRA designated as Loop D into what would become a site for the use of recreational vehicles, planning, designing, approving and constructing the structures, facilities and amenities necessary to support and attract such use.

35.    The APRA can be distinguished from wild or undeveloped areas of the National Forest System, because such recreational areas are actually designed and developed land.  For example, recreational areas contain improvements provided for the goal of user comfort and convenience; and they have defined vehicular circulation.

36.    The Forest Service itself recognizes that visitor safety measures are one of its main duties and part of its core business in providing recreational opportunities to the American public.  Particularly in their development of designated recreation areas, like the APRA, the Forest Service has a continuing duty to follow governing law, regulations, directives and policies in assessing hazards to safety, and developing and implementing best practices to eliminate and reduce the potential for harm to users in developed recreation areas.

37.    The Forest Service recognized that there is potential for the presence of unique or unusual hazards in developed recreation sites, like the APRA, that may not be readily apparent to facility users, including flooding and flash flooding.

38.    The Forest Service defines geologic hazards as geologic conditions or phenomena, including development or alteration by man that present a risk or are a potential danger to life and property. The Forest Service defines floods, especially flash floods, as

geologic hazards creating risks to public safety, for example, to people camping overnight at some developed recreation sites, or people driving roads subject to flash flooding.

39.    In the "Environmental Hazards" section of its Forest Service Health and Safety Code Handbook, FSH 6709.11, the Forest Service warned its employees that "[f]lash flood waves can roll boulders, tear out trees, destroy buildings and bridges, and create new channels." The Handbook warns employees, "[d]o not camp or park your vehicle along streams and washes, particularly during threatening conditions," "[a]void areas subject to flooding" and "[be especially cautious at night when it is harder to recognize flood dangers. (FSH 6709.11, § 54.25 – Flash Floods.)

40.    At all times relevant to the Plaintiffs' claims the Forest Service's goals and policy for floodplain management and wetland protection were to reduce risk of flood loss, to minimize impacts of floods on human safety, health, and welfare, and to prevent floodplain development and new construction in wetlands wherever there was a practicable alternative. (Forest Service Manual (hereinafter "FSM") 2500, 2527.02 & 2527.03.)

41.    The Defendant was aware that floods are among the most frequent and costly natural disasters in terms of human hardship and economic loss. As much as 90 percent of the damage related to natural disasters (excluding droughts) is caused by floods and associated mud and debris flows.  For example, the Defendant knew that, between the years 1925 to present, the average of lives lost due to flooding in the United States was approximately 95 – 150 deaths annually, mostly as a result of flash floods.

42.    The Defendant was aware, or should have been aware, of all prior instances of significant flooding in the APRA. FSM 2500 mandated reporting of "[a]ll floods or other disasters serious enough to attract public attention [which] should be reported by any available

method to the next higher line officer within 24 hours after the occurrence or discovery." (FSM 2500, § 2529.1.)

43.     The APRA has a long history of documented flooding events dating back to at least 1940. The Defendant had documentation of flood events in the years 1940, 1961, 1975, 1982, 1987, 1990, 2001, 2006, 2008, and 2010.

44.     Prior to undertaking the planning, design and approval of the development in Loop D, the Defendant was aware and had available to it a substantial amount of historical information, from a wide variety of sources, including many people employed by the Forest Service who worked or had experience in the APRA, indicating that area had a long history of frequent flooding.

45.     Forest Service planning regulations require evaluation of existing or potential watershed conditions that will influence hazardous events such as floods (36 CFR 219.23(e)). Geologic conditions are part of watershed conditions.

46.     The Defendant was previously aware that the watersheds in the vicinity of the APRA are mainly mountainous watersheds with rapid runoff and narrow floodplains, and that flooding is a geologic hazard on Forest Service property in that area.

47.     Prior to any planning, approval and development, the Defendant was fully aware of detailed geologic facts about the forested area along the river in the APRA, including but not limited to:

    a.  the APRA is located far up within the Little Missouri River watershed toward the headwaters;

    b.  the Little Missouri River is a rocky mountain river flowing through relatively narrow forested canyons;

10

    c.  the river flows at a steep angle;

    d.  a stream flows into the Little Missouri River almost directly across from the area known as Loop D, which the Defendant developed for use by recreational vehicles; and

    e.  the river has many side streams which themselves often have many side streams, all of which increased the risk, frequency and severity of flooding at Loop D.

48.    Some of the flood history and data indicated prior flooding in the area of the APRA at a rate as much as 200 times greater than the 100-year flood plain criteria used in establishing governing law, regulations, policies and procedures for land development.  This known probability of flooding was particularly true of the more easily developed terrain in the area known as Loop D, which was more level and low-lying terrain within the flood plain along the Little Missouri River.

49.    Flood data from a gauge on the Little Missouri River near Langley, Arkansas which was monitored by the U.S. Geological Survey (USGS), served as a basis for Defendant's conclusions regarding the dangers imposed by flooding in Loop D, this data was very limited from a historical perspective.  On a purely comparative basis, the Defendant knew that the flooding at the APRA was less severe, but much more frequent than at the Langley stream gage.

50.    Given that, at that time, there were documents identifying that severe rain events, and associated comparable flooding, in the region was not rare, and that Defendant reasonably could anticipate the probability of storm and flooding events with rainfall amounts up to almost five times the rain associated with a 100-year storm. The Defendant knew or should have known

that planning and development of Loop D should be limited to prevent danger to users from flooding.

51.     District Ranger James Watson, who oversaw development of the APRA, was aware that the area was subject to frequent flooding.  District Ranger Watson remembered an average of two (2) flooding incidents a year at the APRA during his long tenure as the District Ranger in charge of the APRA.  (USDA's Sept. 24, 2010 report on APRA flood ("USDA"), at page 6.)[1]

52.     One particular flooding incident of which Watson was aware involved a flood he believed occurred in 2000 or 2001, when development of Loop D was in the planning stage. In that flood Watson recalled a vehicle and possessions of a visitor being washed downstream near the APRA.  Watson and the Forest Supervisor received several complaints from the effected visitor. (USDA, 6.)

53.     Forest Service Law Enforcement Incident Reports establish numerous previous incidents of flooding in the APRA and on surrounding Forest Service roads. These reports include Forest Service Law Enforcement responses to thirteen (13) separate flooding incidents documented over a period from 2000 through 2008.  Four of these law enforcement incident reports predated November 2000, when District Ranger Watson met with district staff members to first discuss development in the Loop D area of the APRA.  (USDA, 6.)

54.     During the planning process for Loop D, Ken Luckow, a Forest Service soil specialist warned longtime District Ranger James Watson, who was charged by the Defendant

---

[1]  On June 14, 2010, Secretary of Agriculture, Thomas J. Vilsack, directed the USDA to conduct an inquiry into the flood events at the APRA. The purpose of the inquiry was to examine the events proceeding, during and immediately after the flood and to make recommendations based upon findings of fact. The USDA Review Report can be found at http://www.usda.gov/documents/Albert_Pike_Review_Team_Report_September_24_2010.pd.

with much of the decision-making regarding land development in the APRA, not to further develop the area because Loop D was in a 100-year flood plain.

55.     The soil specialist worried that anymore development would disturb the terrain. "Things such as electricity, water and sewer hookups should not be planned," the soil specialist stated in a letter to Watson. (USDA, 13.) This limitation on land development in a flood plain in the National Forest was in accordance with the Defendant's policies and procedures, as well as governing law and regulation.

56.     Based on Forest Service directives, the soil specialist also strongly recommended that flash-flood hazard signs be placed in the areas prone to flooding to provide warning to future users. (USDA, 8.)

57.     Despite these warnings, and his own knowledge of flooding dangers, District Ranger Watson intentionally pushed forward with plans for advanced land development in the area for more specialized uses, including structures, facilities and amenities for use by recreational vehicles. This included paving roads, building concrete RV pads, electricity, water and sewage utilities and bath houses at the new Loop D.

58.     Ranger Watson chose not to include the soil specialist's warnings in the mandatory environmental reports he prepared about the development although governing law and policy required him to do so.  Ranger Watson deliberately ignored his own knowledge of the area and the warnings and recommendations of others because he wanted to meet demand for RV use at the APRA.  (USDA, 13-14.)

59.     District Ranger Watson also failed to relay to architects and engineers planning and designing the Loop D development the findings of the soil specialist, the hydrologist, and he

did not tell him his personal knowledge that the area routinely flooded at least a couple of times a year. (USDA, 16.)

60.    Forest Service policies at the time of development of Loop D mandated that, if critical facilities such as recreation facilities could not be located outside the 100-year floodplain, Best Management Practices and structural mitigation steps must be utilized to reduce the dangerous conditions created by locating such facilities in a floodplain. (USDA, 4.)

61.    No precautions whatsoever were taken in the planning, design and construction of the Loop D development to elevate the RV facilities or move them to a higher elevation readily available in a different section of Loop D to make them safer from dangerous flooding.

62.    As a result of this development of Loop D in a flood prone area with no mitigation or protection against the dangers of flash flooding, the Defendant created a condition it recognized as a "geologic hazard."

63.    The Loop D area was developed and constructed specifically for RV use with all of the attendant structures, facilities and amenities intended specifically for multi-day use by recreational vehicles.  The RV park in Loop D was completed and opened for use during the summer of 2004. People desiring to use their RVs at the APRA now paid a mandatory fee to use the structures, facilities and amenities designated by the Defendant for that use in Loop D.

64.    Defendant knew that recreational vehicles were a specialized use of the APRA, with most owners seeking a safe place to vacation in these costly vehicles.  Owners needed concrete parking pads to protect, level and stabilize the vehicles, as well as utility hook-ups and other RV-specific facilities and amenities to render the RV fully functional in a fashion similar to a home

65.     According to Forest Service records, the newly constructed development in Loop D flooded on July 3, 2004, only three days after it was opened to the public. (USDA, 7.)  This flooding incident, in conjunction with many, subsequent instances of flooding of Loop D, including flooding documented in 2005, 2006, and 2008 should have alerted the Forest Service to the geologic hazard and perils to RV users in Loop D.  (USDA, 17.)

66.     The fact that flooding of the newly-developed Loop D did not result in any reported injuries or deaths, prior to the June 11, 2010 flood, can be attributed primarily to the floods occurring during the off-season and/or because the storms and flooding did not previously occur during times of day when people were sleeping in their RVs.

67.     Despite several flood events after the opening of the RV park, the Defendant did nothing to prevent, mitigate or protect against the known danger of using Loop D, such as closing, moving, or elevating the RV sites, formulating an emergency or evacuation plan for flooding, training the staff regarding the hazards posed by flooding, and providing them procedures to follow to protect users of Loop D, or posting warning signage.

68.     After the Loop D RV park opened and prior to 2010, the Defendant undertook efforts to elevate the tent camping sites in the adjacent Loop C area, specifically for the purpose of protecting users of that area from the dangers of flooding, but did not undertake any similar effort to mitigate the dangers from flooding at the Loop D RV park. (USDA, 17.)

69.     Despite the fact that the Defendant had notice of the flood-danger to RV users in the newly developed Loop D, no signs, or other warning systems were ever put in place to warn RV users and others at the APRA of the dangerous flood-prone nature of the area, particularly Loop D.  There was not an emergency plan, evacuation plan or training regarding the flood danger put in place.  Further, the Defendant was aware of ongoing problems with various forms

of radio communications in the APRA, making it difficult if not impossible to monitor weather forecasts and for staff, volunteers, and law enforcement to communicate to monitor, warn and prevent loss of life in the event of impending floods.

## COUNT I – NEGLIGENCE AND WRONGFUL DEATH

70.      Plaintiffs reiterate and incorporate fully herein the allegations contained in paragraphs 1 through 69.

71.      At all relevant times, Defendant, the United States, and the employees and agents of the United States Forest Service undertook and therefore owed a duty to Kay Roeder, Bruce Roeder and Deborah Roeder, in light of all relevant circumstances, to exercise reasonable care, including the duty to monitor and ensure the safety of the visitors to APRA from foreseeable and known dangers, particularly those created by the Defendant in its development of the APRA.

72.      The development of Loop D was specifically intended as a place to park and use recreational vehicles, yet Defendant knew, or should have known, that flood water at a depth of two feet or less can float most vehicles because it knew one foot of flood water carries approximately 500 pounds of lateral force and each foot of water rising up the side of a vehicle displaces approximately 1500 pounds of weight.

73.      Defendant also knew, or should have known, that nearly half of all flash flood fatalities in the United States are automobile-related.

74.      The Roeders took their recreational vehicle to Loop D expressly for the purpose of enjoying the benefits of the amenities and facilities provided there by the Defendant for users of recreational vehicles. If the Defendant had not provided the structures, facilities and amenities for recreational vehicles that it did, the Roeders would have gone somewhere else, such as the adjacent private RV Park.

75.     Pursuant to 28 United States Code sections 1346(b) and 2674, the United States is liable to recreational users of APRA, to the same extent as any private person in the State of Arkansas.

76.     Pursuant to Arkansas Code section 18-11-307(2), the Defendant is liable for its negligent acts and omissions, which caused the injuries described herein, due to the specific-use fee it imposed on the person or persons who used structures, facilities, and amenities intended for RVs.

77.     Defendant was obligated to charge a fee for the use of the land by recreational vehicles.  It is clear that in developing, designating, and advertising sites within Loop D specifically for RV use, the Defendant was seeking to run a business, and to compete or share in the RV-specific business being run by adjacent private property owners, which many owners of RVs had regularly used before the Defendant provided facilities for RV use at Loop D.

78.     The fee charged was a prerequisite and a direct quid pro quo for use of a designated RV site in Loop D, and entry or use of the sites designed and designated specifically for RV use, including concrete parking pad, hook-ups for electricity, water, sewage disposal and other amenities, was conditioned upon payment of the fee.  The paid-for amenities to enable RV use went beyond what was offered to the general public, who could use other parts of the APRA free of charge.

79.     Defendant had no discretion regarding charging and collecting the fee for recreational vehicle use in Loop D, or to determine how the fees collected were distributed and utilized, which was mandated by law.  The mandatory fee charged for use of RV facilities was not a "contribution in kind," nor specifically used to offset costs or losses incurred by the Forest Service from the RV Park in Loop D.

80.    In developing and managing Loop D, the Defendant negligently failed to follow basic recreation policies set forth at FSM 2303 and its supplementary policies requiring it to ensure that public health and safety were given the highest priority in publicly managed recreation areas.  (FSM 2300, § 2330.3.)

81.    Defendant, the United States, breached its duties owed to Kay Roeder, Bruce Roeder and Deborah Roeder by:

    a.  negligently failing to post signs or otherwise warn RV users of the dangers of flash floods in the area as a result of conditions that the Forest Service knew or should have known existed at the APRA in June of 2010, in violation of Forest Service internal directives relating to flood signing (USDA, at 10);

        i.  As previously stated, a well-known record of significant flooding events existed prior to the tragedy on June 11, 2010.  As admitted by the Defendant, a flooding incident three days after Loop D officially opened, on July 3, 2004, in conjunction with subsequent flooding events "should have alerted the Forest Service to the existence of potential flood hazards at Albert Pike Campground D and should have prompted the Forest Service to undertake mitigation measures, such as posting of warning signs," well prior to 2010 (USDA, 17);

        ii.  Defendant's governing Forest Service Manual (FSM 2527.5 *Posting of Past and Probable Flood Heights*) required the posting of flood hazard signs to enhance public awareness of flood hazards by placing appropriate signs and notices showing the highest flood level and probable 100-year flood height;

iii. Sign and poster guidelines for the Forest Service, EM-7100-15, section 13.2, required posting of flood hazard warning and notices, as well requiring that the Forest Service post supplementary information as needed to inform users; however, due to negligence, such signage and warnings were not posted in the APRA prior to the June 11, 2010 flood;

iv. In its response to the USDA's findings regarding its failings, the Forest Service admitted that "[t]he Ouachita National Forest failed to post hazard warning signs and notices at the Albert Pike Campground even though there was an established record of flooding at Albert Pike and Forest Service guidelines called for the posting of such signs," (Forest Service Oct. 18, 2010 report ("FS"), at 15);[2]

v. Among other failures, the Forest Service Region 8 Flood Sign Coordinator was negligent and failed to coordinate with APRA personnel to share information on flood signs with Regional Sign Coordinators;

b. negligently failing to develop a contingency plan or other mitigation steps to deal with a major flooding event at the APRA, as acknowledged by the Forest Service, (FS, 15);

---

[2] The Forest Service Report, in part a response to the USDA's earlier report on the incident, can be found at http://www.fs.fed.us/news/2010/releases/10/Recreation-Safety-Report-10-18-10.pdf>.

c.  negligently failing to establish controls for watershed improvement activities by providing for adequate supervision during project implementation of the Loop D RV park. ((FSM 2500, § 2522.21);

d.  negligently failing to prevent or mitigate adverse impacts on human safety, health and welfare associated with the occupancy and modification of floodplains and to avoid direct or indirect support of floodplain development wherever there is a practicable alternative, as mandated by the Presidential Executive Order No. 11988 of 1977 (42 F.R. 26951, May 24, 1977);

e.  negligently failing to educate Forest Service employees on Forest Service directives and policies related to flood hazards and negligently failing to implement the directives on critical issues, such as signage and public safety;

  i.  As admitted by the Forest Service, "Ouachita Forest Service employees in Region 8 and on the Ouachita National Forest do not have adequate knowledge of Forest Service directives and policies related to flood hazards and mitigation requirements." (FS, 15).

f.  negligently failing to implement an adequate warning system to notify RV users at Loop D of dangerous weather conditions and flooding risks;

g.  negligently failing to adequately warn of the dangers of the impending storm on June 10-11, 2010 to users at the APRA;

  i.  despite implementing a severe weather policy on the Ouachita Forest and the Caddo-Womble district applicable to Forest Service Employees, the Forest Service failed to implement a similar policy for the safety of users of the Ouachita National Forest, (USDA, 26);

h. negligently failing to give RV users and the APRA Host-volunteers maintaining and overseeing the use of Loop D any prior notice of dangerous weather conditions that were predicted to affect the APRA, including the flash-flood watch that was issued at 11:59 am on June 10, 2010 and was set to remain in effect until 7:00 pm on June 11, 2010;

i. negligently failing to advise the volunteer Hosts that the APRA was located in a flood plain and negligently failing to train the volunteers for a flood contingency plan,

    i. In violation of the following Forest Service Manual directives: FSM 2331.1 *Volunteer Hosts*: Special training and orientation for volunteer hosts is encouraged; FSM 1834.2 *Orientation, Training & Safety*: ...Provide each volunteer orientation on Forest Service history, programs, objectives, environmental quality, and public safety, as appropriate. ... Ensure volunteers receive the necessary training appropriate to enhance their services. Each volunteer shall receive training in safe practices before and during assigned tasks.

j. negligently failing to train or prepare volunteer Hosts at the APRA for emergency situations, including the known dangers of flash flooding, as acknowledged by the Forest Service, (FS, 15);

    i. In violation of the following Forest Service Manual directives: FSM 2331.1 *Volunteer Hosts*: Special training and orientation for volunteer hosts is encouraged; FSM 1834.2 *Orientation, Training & Safety*: ...Provide each volunteer orientation on Forest Service history,

> programs, objectives, environmental quality, and public safety, as
> appropriate. ... Ensure volunteers receive the necessary training
> appropriate to enhance their services. Each volunteer shall receive
> training in safe practices before and during assigned tasks.

k. negligently failing to maintain the APRA Loop D in a reasonably safe condition for public use and failing to protect the health and safety of forest visitors, as required by the Land and Management Plan in effect in June of 2010;

l. negligently failing to monitor and ensure the safety of RV users of Loop D, as required by Section 21.04 of the Forest Service Health and Safety Code Handbook mandating that in project planning line officers and supervisors have the responsibility to "ensure the safety of both employees and the public."

m. negligently failing to evacuate the RV users of Loop D in a timely fashion;

n. negligently failing to repair a broken radio repeater that resulted in an inability to communicate via radio and the loss of 24-hour dispatch services;

o. negligently failing to correct reported broadcast transmission problems from the APRA with two-way Forest Service radio, including malfunction with High Peak repeater that had been malfunctioning for approximately six (6) months prior to June 11, (USDA, 23);

p. negligently failing to provide a NOAA National Weather Service ("NWS") weather radio to the volunteer Hosts to ensure that Loop D users would have a means to be alerted of dangerous weather conditions at the APRA;

q. negligently failing to address communication issues with Forest Service employees and law enforcement personnel and failing to implement alternate means of communications to ensure the safety of APRA personnel and users, as a result of the site's topography, malfunctioning of radio tower repeaters, and known lack of cellular reception;

r. negligently failing to ensure timely emergency response capability for all emergencies, including weather-related emergencies, rather than solely focusing on fire emergencies;

s. negligently failing to implement 24-hour Forest Service dispatch services for emergency situations at the APRA to ensure the safety of personnel and users, (USDA, 18);

t. negligently failing to safely and reasonably construct the nearby sewer system, including failure to clean and maintain sewage drains or basins;

82. The Defendant, including District Ranger Watson and other Forest Service employees, was negligent and failed to exercise reasonable care in planning, proposing, designing, approving, and building the RV park in Loop D in 2001, including but not limited to the following instances:

a. using improper methods to determine the base flood plain;

b. negligently failing to build the RV park in an alternate location outside the base flood plain in the Loop D area, as required by the Land and Resource Management Plan in effect in June of 2010;

c. negligently failing to recognize and mitigate the dangers of constructing the RV park in a flood plain;

d.  negligently failing to include the posting of flood hazard signs and increased elevations in the contract for construction of the RV Park in Loop D, due to flooding risks,

    i.  as admitted by Forest Service personnel, Fleming: "the contract would have been a perfect avenue to include the issue from the NEPA process about signing the area with warning signs about flooding. Fleming did not know why that (signing issue) didn't get entered into the contract." (USDA, 16);

e.  fraudulently misleading the engineers and architects hired to build the Loop D RV park;

f.  negligently failing to notify engineers and architects responsible for constructing Loop D of flood hazards and the flood plain;

g.  intentionally and negligently disregarding specialists' recommendations to limit development of Loop D and not to install electricity, water and sewage hook ups for recreational vehicle use;

h.  negligently failing to follow the mandates of the National Environmental Protection Act ("NEPA") and Forest Service guidelines by unilaterally deciding that the Loop D development was above the 100 year flood plain, based on his own visual assessment,

    i.  as determined by the USDA, Ranger Watson's assertion in the Environmental Assessment that "'none of the new [RV] campsites proposed for Loop D are in the flood plain' is simply not supported by any credible evidence in the project file;" (USDA, 13.)

i.   negligently failing to comply with Forest Service directives on building in a flood plain, the appropriate signage for flood hazard warnings, and other mitigating factors required for construction in a flood plain;

j.   negligently failing to consider the well-documented history of flooding of the APRA;

k.   negligently failing to recognize that National Resource Conservation Service maps clearly show that the entire river corridor along the APRA is located in a flood plain based on the frequency of flooding, (USDA, 15);

l.   negligently failing to comply with NEPA mandates, by failing to complete an Environmental Impact Statement ("EIS"), as the proposed construction of Loop D was a federal land development that significantly affected the quality of the human environment;

m.  negligently failing to adequately supervise development and construction of the Loop D area;

n.   negligently failing to maintain the facilities and development of the Loop D area and surrounding flood plain in the APRA in a reasonable and safe manner; and

o.   Defendant negligently built all roads for egress out of Loop D within the flood plain, without elevating beds or other mitigating measures, knowing that such development was in violation of law, regulations, directives and policies and knowing the history and probability of flooding in the area at a speed and depth capable of sweeping away all vehicles, accompanied by the scouring, destruction and obstruction of the roads resulting from such flooding, meant

all users of Loop D would be trapped and cut off from escape at levels of flooding known to have occurred many times prior to the June 10, 2010 flood.

83.    Prior to the June 11, 2010 flood, the Forest Service was negligent in its failure to generate mandatory documentation of natural disasters and flood damage surveys for the APRA, with documentation of corrective measures and dollars needed to reduce immediate threat to life and property, such as roads and campgrounds, which were classified as the highest or "extreme" priority. (FSM 2500, § 2529.2.)

84.    From approximately 2000 until the June 11, 2010 flood, the Defendant's Regional Foresters, Forest Supervisors, Area Director and others who oversaw, supervised and reviewed the planning, development and training for the APRA were negligent in ignoring mandatory responsibilities and failing to act, including but not limited to:

a.    The Regional Foresters were negligent in failing to develop, implement and ensure compliance with guidelines and procedures for establishing priorities for assessment and monitoring of watershed conditions and trends in the APRA.  (FSM 2500, § 2521.04b.)

b.    The Forest Supervisors were negligent in failing to assess and monitor watershed conditions and trends in the APRA.  (FSM 2500, § 2521.04c.)

c.    The Associate Deputy Chief for Resources, National Forest System, was negligent in failing to ensure that floodplain management and wetland protection and management considerations are included in all Forest Service activities and programs affecting land use.  (FSM 2500, § 2527.04a.)

d.    The Regional Foresters and Area Director over the APRA were negligent in failing to ensure that flood hazards, floodplain and wetland values, and all

alternatives that affect a floodplain or that involve new construction in wetlands were fully considered in the Forest Service planning and decision-making processes for Loop D.

e. Forest Supervisors over the APRA were negligent in failing to:

i. analyze proposed actions affecting floodplains or involving new construction in wetlands to assess the specific flood hazards; quantify floodplain or wetland values of the areas; determine the impacts of the proposal on those hazards and values; formulate and evaluate land and resource management options; come up with a practicable alternative action or location; and determine whether the "no action" option was practicable;

ii. ensure that all practicable and necessary mitigating measures were incorporated in specifications for the proposed action, and that the implementation of the selected action was accomplished in a manner that to the extent practicable, restores and preserves the natural and beneficial values served by floodplains and preserves and enhances the natural and beneficial values of wetlands;

iii. ensure that design, construction, or rehabilitation of Forest Service real property was in accordance with standards and criteria outlined in the National Flood Insurance Program (42 U.S.C. 4001 and following) using flood-proofing measures and structural elevation, where practicable;

iv. provide for the placement of appropriate signs to enhance public awareness of and knowledge about flood hazards; and

     v.  cooperate with State and County governments in the development and implementation of appropriate early flood warning and evacuation plans. (FSM 2500, § 2527.04c.)

f.  The Forest Supervisors over the ARPA negligently failed to:

     i.  prepare design narratives, site plans, and final drawings for Loop D;

     ii.  develop Loop D sites and facilities in accordance with established objectives and policies and Forest land and resource management plans; and

     iii.  monitor operation and maintenance actions in Loop D. (FSM 2300, § 2330.42b.)

g.  The Regional Foresters over the APRA were negligent in failing to:

     i.  coordinate flood and other natural disaster surveys with resource planning among National Forests, and with similar efforts of other Federal, State, and area wide agencies, and

     ii.  arrange for obtaining quantitative precipitation forecasts and assisting National Forests with timely flood or high water warnings to expedite damage control activities. (FSM 2500, § 2529.04a.)

h.  The Forest Supervisors over the APRA were negligent in failing to:

     i.  investigate all significant disasters promptly, appraise their impacts upon goals and targets, and recommend program adjustments for consideration by the Regional Forester;

     ii.  analyze environmental impacts; and

iii. ensure Forest Service participation in State and local early flood warning systems. (FSM 2500, § 2529.04b.)

85.     In sum, in developing Loop D for RV use, the Defendant ignored its own policies, rules, and regulations to eliminate safety hazards from developed recreation sites, including immediately correcting high-priority hazards that developed, or were identified in Loop D during the operating season or to close the site. (FSM 2300, § 2332.1.)

86.     The Defendant knowingly, negligently, willfully, wantonly and recklessly failed to follow law, regulations, directives and policies governing development and building in a flood plain and accompanying warning systems and emergency planning.

87.     The Defendant knowingly, negligently, willfully, wantonly and recklessly placed RV users, including the Roeders, in harm's way when it developed Loop D for RV use, held the area out to the public to be fit and safe for RV use, and failed to mitigate, protect or warn RV users, including the Roeders, of the dangers of flash flooding to which the Defendant exposed them in its development of Loop D.

88.     As a direct and proximate result of the negligence described hereinabove, the United States, through its agencies, employees and agents, caused or were a substantial factor in causing the deaths of Kay Roeder, Bruce Roeder and Deborah Roeder.  It was reasonably foreseeable to the Defendant, its agencies, employees and agents, that the negligent acts and omissions described hereinabove would cause injuries similar to those suffered by the Roeders.

89.     But for the negligent acts and omissions by the United States, through its agencies, employees and agents, as described hereinabove, Loop D would not have been useable by RVs,, Kay Roeder, Bruce Roeder and Deborah Roeder would not have been able to make

such use of the APRA on June 10 – 11, 2010, and more likely than not they would have survived the June 11, 2010 flood at the APRA with little or no injury.

90.     But for the negligent acts and omissions by the United States, through its agencies, employees and agents, as described hereinabove, in failing to watch, warn, train or prepare for dangerous emergency situations, including the known dangers of flash flooding, Kay Roeder, Bruce Roeder and Deborah Roeder would have been warned or evacuated from Loop D and more likely than not they would have survived the June 11, 2010 flood at the APRA with little or no injury.

91.     The Plaintiffs assert claims for all compensatory damages, including, but not limited to, the physical injuries and deaths described herein, pain and suffering, mental anguish and emotional distress, loss of life, loss of consortium, loss of services and contributions, medical expenses, caretaking and custodial care and property damage, including any such damages reasonably certain to be incurred in the future, in an amount to be determined by the fact-finder, plus the costs of this litigation, and all of the relief to which the Plaintiffs are entitled to by law.

92.     The personal property losses claimed by the Plaintiffs previously were provided to the Defendant in specific detail in their claims for damage, injury, and death, and include but are not limited to:

       a.  2004 F250 Supercab Harley Davidson Lariat truck, owned by Bruce Roeder, with an estimated value of approximately $20,000;

       b.  2007 Keystone Sprinter travel trailer, owned by Bruce Roeder, with an estimated value of approximately $38,000;

    c.  2009 Nissan Altima S SL Sedan, owned by Deborah Roeder, with an estimated value of approximately $23,000;

    d.  Other items of personal property with an aggregate estimated value of approximately 20,000.00.

93.  Prior to and at the time of the June 11, 2010 flood, the Defendant knew, or in the exercise of ordinary care should have known in light of the surrounding circumstances, that their above-described conduct would naturally and probably result in injury to others, yet it continued the conduct maliciously, and with deliberate indifference and reckless disregard of the consequences.  Thus, punitive damages should be imposed in this case.

## COUNT II –MALICIOUS CONDUCT REGARDING AN ULTRAHAZARDOUS CONDITION, USE OR STRUCTURE

94.  Plaintiffs reiterate and incorporate fully herein the allegations contained in paragraphs 1 through 93.

95.  Design, planning, approval, development and construction of the structures, facilities and amenities specific for the RV park in Loop D took place despite the Defendant's knowledge that such use was inherently dangerous, and that such development violated governing law, regulations and its own policies and procedures designed to prevent adverse impacts on human health, safety and welfare created by land use development in flood plains.

96.  Development and construction of an RV park in Loop D was an "ultrahazardous" condition, use or structure within the meaning of that term pursuant to the Arkansas Recreational Use Act, Arkansas Code sections 18-11-301 *et seq.*

97.  Defendant itself defined flooding on Forest Service land as a "geologic hazard" and, in assessing areas for development for recreational use, the Defendant described areas prone to frequent flooding as a "high hazard."

31

98.     The acts and omissions by the Defendant, its agencies, employees and agents, described herein were "malicious" within the meaning of that term pursuant to the Arkansas Recreational Use Act, Arkansas Code sections 18-11-301 *et seq.*, and as that term is defined by Arkansas law, including as the term malicious is defined for the purpose of determining liability for punitive damages.

99.     Thus, as set out more fully below, the United States of America is liable to the Plaintiffs in tort, under the Arkansas Recreational Use Act, both due to its malicious failure to protect RV users, like the Roeders, from the ultrahazardous condition, use and structures in developing an area with a known history of frequent flooding and also for the failure to warn RV users, like the Roeders, regarding the existence of that ultrahazardous condition, use and structures.

100.    The conduct of the Defendant was malicious, or deliberately and recklessly indifferent in failing to protect against the ultrahazardous condition it knew existed and that it had created in planning and designing Loop D for RV use, including but not limited to:

a.  In locating the RV park immediately adjacent to a river in a flood plain and in an area known to be prone to frequent flooding at dangerous levels, the Defendant maliciously or recklessly created a high degree of risk and danger of serious injury, death and property damage for RV users in the APRA by exposing them to an area it knew to be a geologic hazard to such use.

b.  The Defendant acted with malice, or deliberate or reckless indifference in relying on flood data from the USGS stream gauge at Langley to plan and develop Loop D, especially given that the Langley data was for a location approximately 8 to 9 miles downriver from the APRA.

32

c. Even if the Langley stream data had been a reliable basis for development in the Loop D flood plain, the Defendant acted with malice, or deliberate or reckless indifference in developing Loop D because it knew that there had been prior flooding at the APRA at levels equally or nearly as hazardous as the June 2010 event.

d. Defendant acted with malice, or deliberate or reckless indifference in developing Loop D because, based on the available records and data, it knew that flooding of the APRA on or about the level experienced on June 11, 2010, occurred on less than a 15-year return frequency, with some data for the area tributary to the APRA indicating a 4- to 5-year storm and other data indicating a frequency of once every 2 years.

e. Defendant acted with malice, or deliberate or reckless indifference in developing Loop D because, based on the available data, it knew that soil data indicated that flooding at Loop D could be expected to occur (a) on a frequency ranging from approximately once every two months to once every two years, or (b) once per year.

f. The Defendant acted with malice, or deliberate or reckless indifference in its failure to comply with mandatory safety policies and to ensure such compliance in the development of Loop D, including Forest Service policies mandating that critical facilities, including recreation facilities, should be located outside the 100-year floodplain specifically to protect the health and safety of personnel and users (USDA, 4.).

g.  The Defendant acted with malice, or deliberate or reckless indifference by developing Loop D where it knew that Forest Service employees and specialists indicated that Loop D should not be further developed, due to the fact that the 100-year flood plain extended beyond Arkansas State Highway 369, which formed a boundary for Loop D on the far side of its boundary with the Little Missouri River.

h.  The Defendant acted with malice, or deliberate or reckless indifference in using the Bankfull method of measuring or identifying the danger of flooding in a particular area near a river, where the Defendant knew, or should have known that:

   i.  Forest Service hydrologist, James Clingenpeel, who was directed to participate in the assessment, planning and design of Loop D, used the Bankfull method or his understanding of such method. (USDA, 5.)

   ii.  The Bankfull field method for determining flood plain elevation was not an authorized method according to U.S. Forest Service directives contained in Forest Service Region 8 Supplement 2500-92-1, and the Defendant knew such method was less accurate than the approved methods for determining a flood plain elevation.  (USDA, 5.)

   iii. The Bankfull method was seriously flawed from a hydrologic perspective, and resulted in the identification of the 100-year floodplain in the Loop D area that was smaller than was actually the case.

       iv. The Bankfull method also was flawed from a site planning perspective, and it was reckless to rely on that method in concluding that the area to be developed as Loop D would not be within the 100-year floodplain.

       v. The Bankfull method was substantially inadequate from a comprehensiveness perspective, since only one floodplain line siting was undertaken, while at least four were required, given the length of the property along the Little Missouri River being considered for development in the Loop D.

i. The Defendant acted with malice, or deliberate or reckless indifference in failing to employ more accurate methods for determining the 100-year floodplain, especially given the health, safety and welfare interests at stake due to the number of people potentially impacted by the development of Loop D.

j. Reliance on the Bankfull method aside, the Defendant acted with malice, or deliberate or reckless indifference in developing Loop D because even use of the Bankfull method established that:

       i. All of the Loop D area was within the 100-year, or base, floodplain;

       ii. The site designated as D3, which was the site occupied by the Roeders RV on June 10, 2010, would be expected to flood approximately 65 to 70 times every 100 years; and

iii. In the 100-year flood, site D3 would be expected to be inundated with approximately 9 feet of very fast moving water, inherently an ultra-hazardous and deadly condition.

k. Defendant acted with malice, or deliberate or reckless indifference in developing Loop D for RV use where it knew, or should have known, that all of the area being considered for development and, under most analysis, an additional area beyond Loop D, was within the 100-year floodplain:

i. Photographs of the area are consistent with the conclusion that all of the developed sites in Loop D were within the 100-year floodplain.

ii. In a letter dated November 28, 2001, by Ken Luckow, the Forest Soil Scientist, who was directed by Defendant to study soil and geologic conditions and to make recommendations regarding development of Loop D, indicated the area was "subject to frequent flooding" and "[e]vidence of a recent major flood event" could be observed along the river bordering the APRA. (USDA, 6.)

iii. Notwithstanding his underestimation of the probability of flooding, Mr. Luckow still concluded that the RV sites in Loop D were within the 100-year floodplain. (USDA, 13.)

l. Defendant acted with malice, or deliberate or reckless indifference in developing Loop D for RV use where it knew that soil-mapping of the area around Loop D, undertaken in conjunction with a site visit to observe soil conditions by Defendant's specialist, provided a significant basis for

36

concluding that all of Loop D and some adjacent areas further away from the stream past Loop D were within the 100-year floodplain.

m. Defendant acted with malice, or deliberate or reckless indifference in developing Loop D for RV use where it knew, or should have known, that District Ranger Watson did not rely on the determination made by the Forest Service Hydrologist, James Clingenpeel, using survey instruments, but relied instead on his own visual determination where the flood plain line was and concluded that the Loop D development would be above the flood plain level. (USDA, 5.)  In a subsequent interview, Mr. Clingenpeel stated "Ranger Watson was just going on his speculation or imaginary elevation for the project."

n. Defendant acted with malice, or deliberate or reckless indifference in developing Loop D for RV use where it knew, or should have known, that District Ranger Watson intentionally disregarded the scientists' findings and recommendations in order to develop Loop D because the District Ranger wanted the sites to be developed rather than primitive in nature, so as to meet perceived public expectations and fully utilize the money appropriated for the project by the Defendant. (USDA, 14.)

101.   Defendant's conduct also was malicious, or deliberately and recklessly indifferent of the consequences, where it knew or should have known that, if the development had been in the northern portion of the Loop D area rather than the lower-elevation, the danger from injury or death to users of recreational vehicles due to flooding would have been eliminated or greatly decreased.

102.    The conduct of the Defendant was malicious, or deliberately and recklessly indifferent in failing to protect against the ultrahazardous condition it knew existed and that it had created in approving Loop D for RV use, including but not limited to:

    a.  Prior to approving the development of Loop D for RV use, the Defendant knew that its own employees and specialists, who were directed to participate, plan, design, manage and/or control further development of the APRA, had indicated there should have been no further development within Loop D, pursuant to the dictates of law, regulations and policies governing such development in a flood plain.

    b.  The Defendant also knew that the National Environmental Policy Act of 1969 (NEPA), as amended, requires federal agencies to consider potential environmental impacts before taking major actions, such as issuing permits or making decisions that affect federal lands, including land use development by the Forest Service.

    c.  Preparation of the Environmental Assessment ("EA") required by the NEPA is a critical step in the land use development process related to not only general environmental issues, but also human health and safety considerations.

    d.  Although the NEPA Coordinator normally completed the EA, District Ranger James Watson did so for the APRA development in Loop D.

        i.  Ranger Watson performed a "cut and paste" of portions of the hydrologist and soil scientist's type findings in drafting the EA in an

38

intentional ploy to avoid full NEPA review or compliance. (USDA, 13.)

ii. Watson ignored the finding of the Forest Service specialists in noting in the EA that "none of the new camp sites proposed for Loop D are in the flood plain." Watson knew this assertion was not true and was contradicted by others working on the project. (USDA, 13.)

iii. District Ranger Watson made a "Finding of No Significant Impact" declaring that the project was not a major Federal action and would not significantly affect the quality of the human environment and, therefore, that the more-substantial and mandatory Environmental Impact Statement was not prepared.

iv.

v. Watson's conduct was malicious or deliberately indifferent in completely ignoring the review process required by the NEPA for land development on a floodplain.

vi. The conduct of Lisa Cline, the Forest Service's NEPA Coordinator for the area, and the District NEPA Coordinator, Kathryn Duncan, also was malicious, or deliberately or recklessly indifferent, in permitting themselves to be taken out of the project and, thereby, failing in her duties to provide oversight, management and ensure compliance with the NEPA for the Loop D project;

vii. A request to participate in the NEPA process by Mike White, a staff officer with Forest Service Engineering, was denied;

viii.  No post-project review was done by the specialists whose reports were to have contributed to the EA.  (USDA, 16.)

ix.  The Engineering staff was not provided with copies of the EA; instead, they were only provided a copy of the Decision Notice by District Ranger Watson.  (USDA, 16.)

e.  The EA was prepared by an under qualified employee, and the lack of monitoring by any supervisor, which contributed to the creation of an ultrahazardous condition and use upon the APRA property;

f.  The Defendant acted with malice or deliberate indifference in circumventing the NEPA process, which would have prevented development of Loop D for RV use, or required mitigation of the danger such development posed.

g.  In designing facilities and infrastructure for the construction project at Loop D, the Forest Service Landscape Architect and the Forest Service Engineering Staff were not informed of any flooding issues with respect to the Loop D development.

h.  Although District Ranger Watson was instrumental in the decision making process for the development of Loop D, he did not make decisions in a vacuum or apart from other Forest Service staff and personnel including his supervisors and others with oversight duties for development in the APRA, and the Defendant approved Watson's planning, NEPA assessment and development proposal for Loop D.

103.  The conduct of the Defendant was malicious, or deliberately and recklessly indifferent in failing to protect against the ultrahazardous condition it knew existed and that it

had created in bidding out, constructing, and building Loop D for RV use, including but not limited to:

    a. The Defendant acted with malice, or deliberate or reckless indifference in ignoring its own requirements for Best Management Practices or structural mitigation steps, which its policies mandated regarding land use development in a flood plain, and its failure to ensure such compliance in the development of Loop D.

    b. , The Forest Service Landscape Architect was aware of the flooding concerns of an adjacent area known as Loop C, and the Forest Service Landscape Architect charged with the design had personal knowledge of flooding events at the site; thus, design plans included raising or moving some of the proposed sites in Loop C due to flooding concerns. (USDA, 16-17.)

    c. But for malicious, or deliberate or reckless indifference by the Defendant, the Forest Service Landscape Architect would have been informed of flooding dangers in the Loop D area and, thus, design plans for Loop D would have at least included similar, mitigating, safety measures.

    d. In 2003, the Defendant acted with malice, or deliberate or reckless indifference where the specifications, which were provided by the Forest Service Engineering staff, used in contracting the Loop D development project, and as a guide for construction by a private contractor, contained no direction to protect or mitigate against the flood hazard, such as posting warning signage in Loop D or elevating the loop road and the RV sites. (USDA, 17.)

e.  As tacitly conceded through its act of raising the elevation of existing sites for tent camping in Loop C during 2003 or 2004, due to the dangers of flooding from the proximity of the Little Missouri River, the Defendant acted with malice, or deliberate or reckless indifference where it knew that the sites for RV use in Loop D, if developed at all, should have been constructed at a higher elevation to provide similar mitigation and protection against the ultrahazardous condition created by locating such sites within the 100-year floodplain.

f.  During annual inspections of the APRA and the Loop D RV park, in the years preceding the June 11, 2010 flood, the prior incidents of flooding reported to the Defendant should have spurred subsequent consideration of preventative or mitigating measures.

g.  However, at no time prior to the June 10, 2012 tragedy did the Defendant undertake to close Loop D to recreational vehicles or to otherwise eliminate or to mitigate the dangers in that area that the Defendant designated and charged specifically for that use.

h.  The Defendant's continuing conduct in permitting use of the RV park in Loop D, despite its knowledge of the ultrahazardous nature of this use, demonstrates malicious and deliberate indifference to the consequences of its conduct.

i.  Subsequent to the June 11, 2010 flood, in statements to the public and in its internal investigations, Defendant took the position that the deaths, injuries and property damage due to flooding in Loop D was not foreseeable or preventable due to its purportedly unprecedented nature, despite the

Defendant's knowledge that many previous floods established the ultrahazardous condition, use and structures in Loop D.

j.   Defendant's position that the unprecedented nature of the June 11, 2010 flood excused its failures to protect against the ultrahazardous condition, use and structures in Loop D, reflects malice, or deliberate or reckless indifference by ignoring that Loop D was prone to frequent and dangerous flooding, regardless of the exact level, frequency or magnitude of any particular flood.

104.   The Defendant's development of the Loop D RV park was intended to attract and induce such use, creating an implication and justifiable reliance on the part of RV users, like the Roeders, that the condition of Loop D and its structures, facilities and amenities were safe for their intended use and free from ultrahazardous conditions, like flash flooding, which were not open and obvious to RV users.

105.   The Defendant acted with malice, or deliberate or reckless indifference in developing and constructing Loop D for RV use because it knew a reasonable person seeking to use the RV facilities in the APRA would be unaware of the geologic hazard posed by that use, and would have no notice of the dangers of flash flooding in Loop D, because that danger was not open or obvious to RV users, including the Roeders.

106.   The Defendant acted with malice, or deliberate or reckless indifference, in taking affirmative steps to place RV users in harm's way through advertising, inviting, and directing them to the area of Loop D specifically developed for use by recreational vehicles, particularly where no such danger had previously existed.

107.   But for the Defendant's planning, design, approval and construction of a facility for the use of recreational vehicles in Loop D, the Roeders would not have brought their RV to

the APRA for such use, and they would not have been placed in a danger by the ultrahazardous condition, use and structures that resulted in their deaths on June 11, 2010.

108.    As a direct and proximate result of the malicious failure to protect against the ultrahazardous condition described hereinabove, the Defendant, its agencies, employees and agents, caused or were a substantial factor in causing the deaths of the Roeders.

109.    At all relevant time periods before and after the development of Loop D for RV use, the Defendant was aware of its duty to plan for contingencies and to warn users of recreational areas to reduce the risks and perils associated with the geologic hazard posed by flooding, including appropriate signage and distribution of information to the public, awareness and training of staff and volunteers, implementation of emergency and evacuation plans, monitoring of weather forecasts, and issuance of timely and effective warnings.

110.    The conduct of the Defendant was malicious, or deliberately and recklessly indifferent in failing to make any contingency plan, train staff, install a warning system, or install signage warning RV users of the ultrahazardous condition use and structures it knew existed and that it had created in developing Loop D for RV use, including but not limited to:

    a.  There was no emergency plan, including an evacuation plan, for the APRA, which should have existed based on the likelihood and history of flooding and the significant possibility of loss-of-life associated with such flooding. Instead, the Defendant acted with malice, or deliberate or reckless indifference in failing to implement any emergency plan for flooding, including the following acts and omissions:

    b.  The Forest Supervisor over the District Ranger admitted that no such emergency plan or evacuation plan existed at the time of the incident in June

44

2010, although it was required by the Defendant and numerous Forest Service personnel realized the importance of such a plan, and the probability that such a plan could save lives.  (USDA, 20.)

c.   The Defendant's failure to have any emergency or evacuation plan in place prior to June 11, 2010, despite its knowledge of the ultrahazardous nature of the condition and use of Loop D, demonstrates malicious and deliberate indifference to the consequences of its conduct.

d.   Such a plan would have significantly decreased the probability of loss-of-life in such an event.

111.    Training should have been provided to appropriate staff and volunteers by the Forest Service concerning how to respond to the possibility of flooding at the APRA.  (USDA, 20.)  Instead, the Defendant acted with malice, or deliberate or reckless indifference in failing to implement any training of APRA management, staff, and volunteers regarding the known geologic hazard in Loop D, which could have saved lives during June 2010.

112.    Warning signage should have been placed in appropriate locations in the APRA and Loop D, including high-water and 100-year flood plain indicators, based on the likelihood and history of flooding and the significant possibility of loss-of-life associated with such flooding.   Instead, the Defendant acted with malice, or deliberate or reckless indifference regarding lack of warning signage, including but not limited to:

a.   Defendant knew or should have known that documentation within the planning for Loop D, including a letter from the soil specialist, advised of the need for flood warning signs within Loop D.  (USDA, 3.)

45

b. The Environmental Assessment submitted by District Ranger James Watson and required for approval of the development of Loop D stated that signs would be posted to warn the public of the possibility of flash flooding.

c. Subsequent to the June 11, 2010 flood, District Range Gloria Chrismer admitted that there had been no signs posted at the APRA concerning water or flash flood dangers.

d. Although Forest Service directives required the posting of flood hazard warning signs, the Region 8 Sign Coordinator admitted that there was no training of the District Ranger or Recreation Technicians, who were responsible for the posting of flood warning signs in the APRA. (USDA, 11.)

e. Interviews conducted by the USDA Review Team establish that most Ouachita National Forest employees were unaware of flood hazard signing requirements applicable to the APRA. (USDA, 9.)

f.  Forest Service engineers conducted a final inspection on Loop D prior to its opening, and health and safety inspections occurred annually for the APRA after that, but the inspections failed to note or recognize the significant danger to overnight users at the APRA due to flooding and, as such, no measures were taken to prevent, mitigate or protect against this known danger. (USDA, 17.)

g. Defendant knew or should have known that signs posted in Loop D identifying the 100-year floodplain and the previous maximum known flood level, as was required by Forest Service policy, would have made it

significantly more likely that more, and maybe even all, of those using the facilities in Loop D would have survived.

113.    The nature of the watershed and terrain at the APRA, and the geologic hazard known to pose a risk of serious injury and death to the RV users in Loop D, placed upon the Defendant an affirmative duty to have personnel to monitor storm forecasts, flood warnings and the rise in river elevation in the vicinity of the APRA.

114.    Although the Little Missouri River was rising quickly, it was more likely than not, that timely warning of the flood danger, resulting from monitoring of storm and flood warnings, would have saved the lives lost in Loop D on June 11, 2010, because:

    a.  Providing personnel to monitor and warn park users of impending flood dangers is a commonly-accepted practice in state parks in Arkansas, and nearby Hot Springs National Park, which has a flash flood warning system in place;

    b.  Warnings to visitors by a campground owner/manager at a private campground near the APRA, who based upon his prior experience and knowledge regarding the flood-prone area stayed awake into the early morning hours of June 11, 2010, to monitor the storm to ensure the safety of his overnight campers;

    c.  At other privately-owned cabins near the APRA by two individuals, who happened to be awake, noticed the flooding and went door-to-door waking and warning others who then escaped; and

      d.  The result of these warnings at other sites during the same storm resulted in only one person dying at one of these areas and none dying at the other two places.

115.    Instead, the Defendant acted with malice, or deliberate or reckless indifference in failing to monitor and issue timely warnings for flooding in Loop D, including the following acts and omissions:

      a.  Forest Service Law Enforcement Officers had been pro-active in notifying campers in the APRA of flood dangers in the past, where storm or flood dangers were forecasted when it was convenient to staff on duty during business hours. (USDA, 7.) Defendant deliberately and intentionally did not undertake to monitor and warn of flood dangers after hours, despite its knowledge that a substantial amount of flash flooding occurs during the night hours and is more deadly than daylight flooding.

      b.  Defendant's malicious and indifferent conduct in failing to monitor and warn regarding the dangers of flash flooding at the APRA is particularly significant given reports that Forest Service employees were onsite on June 10, 2010, but did not warn anyone of the flood watch issued prior to noon that day.

      c.  Defendant's malicious and indifferent conduct in failing to monitor and warn regarding the dangers of flash flooding at the APRA is particularly significant given that, in the wake of the June 11, 2010 flood, District Ranger Chrismer admitted that she knew of the flash flood watch when she went to bed on June 10, 2010, but did nothing to warn law enforcement staff on duty, volunteer

hosts at the APRA, or the RV users at Loop D of the danger because she had not been instructed or trained to do so.  (USDA, 26.)

    d.  RV users in Loop D had a reasonable expectation that APRA staff and volunteers, as well as Forest Service Law Enforcement, would undertake to monitor and warn of flood dangers occurring after hours.

116.    The Defendant's conduct was malicious and deliberately or recklessly indifferent in failing to have personnel monitoring, directly or remotely, the rise in river elevation in the vicinity of the APRA, and ready to warn staff, volunteers and users of the APRA throughout the course of the storm leading up to the flood on June 11, 2010 particularly given the low burden and cost of doing so.

117.    Defendant's failure to require the repair or replacement of a nearby weather radio tower for nearly two years, delaying the repair or replacement until after 20 people died due to lack of warning of flash floods, demonstrates malice and deliberate or reckless indifference to the foreseeable consequences of such conduct, where:

    a.  The Defendant knew that a weather radio tower could continually and reliably broadcast NWS weather radio service to the APRA, and such a tower was in place until 2008 when it fell or failed.  (USDA, 24.)

    b.  As a result, the Defendant knew that staff, Law Enforcement, Volunteer Hosts and RV users in Loop D could not receive weather radio broadcasts.  (USDA, 24.)

    c.  Despite the known geologic hazard and the danger posed by it, the Defendant took no action to replace the tower for nearly two years, not until after the June 2010 flood.

    c.  Subsequent to the flood, the Defendant put in place a full-service weather radio tower broadcasting to the APRA.

    d.  Defendant knew or should have known that it was more likely than not that had such a tower been operational on June 10 or June 11, 2010, there would have been no or only very minor loss-of-life due to the ability of RV users in Loop D to be made aware of the impending flood through weather radio forecasts, watches and warnings.

118.    There were available to the Defendant, alternative systems to monitor for severe weather, which were in common use and could have been in place at the APRA in June 2010, and which more probably than not would have resulted in substantially less, and maybe no, loss-of-life in June 2010.  Knowing the severe danger posed by the geologic hazard it created for users of Loop D, the Defendant acted with malice, or deliberate or reckless indifference in failing to implement any alternate system for monitoring for risk of flooding.

119.    Two-way radio communications were in use by the Defendant, and the Defendant knew that APRA employees and Forest Service Law Enforcement were dependent on such service to transmit and receive Forest Service communications.  The Defendant acted with malice, or deliberate or reckless indifference where it knew such service was out-of-operation at the APRA for a significantly long period, including June 2010, such that two-way radio service was not available to Forest Service Law Enforcement, APRA staff and volunteer hosts or others who could have used the radios to protect, warn and aid RV users in Loop D, immediately prior to and during the June 2010 flood.  (USDA, 23.)

120.    The APRA had dispatch service in place on a 24-hour basis during periods when there is concern with injury and/or loss-of-life due to forest fires.  Defendant acted with malice

and deliberate or reckless indifference where no such similar dispatch service was in place during periods of concern for flooding, despite the Defendant's knowledge that the risks of death, severe injury and catastrophic destruction of property from flooding at the APRA were significantly greater than those from fire. (USDA, 23.)  If such dispatch service were in place during June 2010, it would have more likely than not resulted in substantially less or no loss-of-life in Loop D.

121.    The Defendant acted with malice or deliberate or reckless indifference to the fact that Loop D was very popular for RV use, not to mention that the Defendant ignored the fact that substantial numbers people would be camping in Loops A, B, and C, requiring that measures be taken to monitor and warn of flooding to substantially reduce the likelihood of loss-of-life in the APRA.

122.    The fact that approximately half of those at sites in Loop D and all of those camping in Loops A and B on June 11, 2010, survived the flooding, confirms that, had some or all of the many steps that should have been taken by the Forest Service to mitigate, protect and warn had been implemented, it is more likely than not that there would have been substantially fewer deaths and the Roeders would have been among the survivors of the flood.

123.    From approximately 2000 until the June 11, 2010 flood, the Defendant's Regional Foresters, Forest Supervisors, Area Director and others, who oversaw, supervised, reviewed planning and development, trained and who were charged with ensuring compliance with law, regulations, directives and policies regarding the APRA, acted with malice or deliberate or reckless indifference by ignoring their job duties and responsibilities for critical issues, including watershed protection, management and development; compliance with the NEPA, assessment

and mitigation of geologic hazards, and safety in the management and operation of the Loop D RV park.

124.    Policies in place at the time of the June 11, 2010 flood substantiate that the Defendant was fully aware of the dangers of not providing warnings of the dangers of flooding, including in relation to occupancy of floodplains, flood level and hazard signs, flood warnings, evacuation plans, flood mitigation measures, flooding impacts on human safety, flood training, public notification of flood hazards, avoiding areas subject to flooding, flood safety concerns at night, and the need for campsites to be free of dangers from flooding.

125.    But for the Defendant's failure to put into effect any emergency or evacuation plan, training program, signage, and to monitor and warn regarding the danger of flooding in Loop D, the Roeders would not have brought their RV to the APRA and they would not have been placed in a danger by the Defendant due to that use, which resulted in their deaths on June 11, 2010.

126.    As a direct and proximate result of the malicious, or deliberate or recklessly indifferent, failures to protect and warn regarding the ultrahazardous condition, use and structures in Loop D described in the foregoing paragraphs, the Defendant, its agencies, employees and agents, caused or were a substantial factor in causing the deaths of the Roeders, as well as the other injuries and property damage set out herein.

127.    The Plaintiffs assert claims for all compensatory damages, including, but not limited to, the physical injuries and deaths described herein, pain and suffering, mental anguish and emotional distress, loss of life, loss of consortium, loss of services and contributions, medical expenses, caretaking and custodial care and property damage, including any such damages reasonably certain to be incurred in the future, in an amount to be determined by the

fact-finder, plus the costs of this litigation, and all of the relief to which the Plaintiffs are entitled to by law.

128.    The personal property losses claimed by the Plaintiffs were previously provided to the Defendant in specific detail, and include but are not limited to the property losses described in paragraph 92 above.

129.    Prior to and at the time of the June 11, 2010 flood, the Defendant knew, or in the exercise of ordinary care should have known in light of the surrounding circumstances, that the above-described conduct would naturally and probably result in injury to others, yet it continued the conduct maliciously, and with deliberate indifference and reckless disregard of the consequences.  Thus, punitive damages should be imposed in this case.

130.    Not only do the foregoing malicious acts and omissions by the Defendant render it liable for the Plaintiffs' injuries and damages alleged herein, including the wrongful deaths of the Plaintiffs' decedents, but Defendant's reckless disregard for the consequences of its malicious conduct require an award of punitive damages in this matter.

## COUNT III –VIOLATIONS OF DUE PROCESS DUE TO STATE-CREATED DANGER

131.    Plaintiffs reiterate and incorporate fully herein the allegations contained in paragraphs 1 through 130.

132.    The Due Process Clause of the Fourteenth Amendment to the Constitution of the United States imposed a duty on the Defendant to protect individuals, including the Roeders, against loss of life, liberty or property, where the Defendant, its agencies, employees and agents, created the danger to which the Roeders were subjected.  Violations of due process rights are enforceable pursuant to the Civil Rights Act of 1871, 42 U.S.C. section 1983.

133.    As stated above, in planning, design, approval, development and construction of the Loop D RV Park, the Defendant intended and made available that Forest Service property for use by members of a limited and precisely definable group, owners and users of recreational vehicles.

134.    Loop D did not exist as a site and a facility for RV use until the Defendant planned, designed, developed, constructed and designated that site for that use.

135.    The Defendant decided which portion, if any, of APRA would be made available beyond general use, and specifically designated and constructed for use by recreational vehicles. The Defendant alone had the right to plan, design, develop, construct and designate a site for recreational vehicle use on public lands in the APRA.

136.    The Defendant had the luxury of time to make unhurried judgments regarding the development of Loop D and the safety and welfare of users of the RV Park the Defendant built there.

137.    Knowing the general danger of flooding in Loop D and the specific danger posed to users of the RV park on June 10 and June 11, 2010, the Defendant was grossly negligent and affirmatively placed the Roeders at risk and in a position of serious, immediate and proximate harm, which they would not otherwise have faced, first by developing Loop D for RV use and then by directing and permitting the Roeders to use the Loop D RV park.

138.    Due to the specific use, overnight stays in an RV for multiple days, as well as the specific location the Defendant was grossly negligent and chose and developed for that use, in a floodplain prone to dangerous flash floods, the Roeders were more vulnerable to the danger created by the Defendant than other citizens making general, recreational use of the APRA.

139.    As set forth above, the United States of America, through its agencies, employees and agents, had knowledge regarding the geologic hazard of developing Loop D for RV use and acted recklessly, and with deliberate indifference and in conscious disregard of the risk in planning, designing, approving, developing and constructing Loop D for that use.

140.    The grossly negligent acts and omissions by the United States of America in planning, designing, approving and constructing the Loop D RV Park in an area known to be a geologic hazard to life, limb and property due to flooding, created a danger where none previously existed.

141.    The Defendant affirmatively placed the Roeders in a position of danger they would not otherwise have faced.  But for the Defendant's conduct, the Roeders would not have been enticed to enjoy the benefits of the Loop D RV Park and, thus, they would not have been exposed to the danger from floods created in the planning, design, development and construction of Loop D for such use.

142.    That RV users in Loop D would most likely be swept away, battered and drowned by a flash flood in the middle of the night was entirely foreseeable to the Defendant and, indeed, was an inevitable tragedy that the Defendant was aware of based on its knowledge of past flood events and the high-hazard the Defendant knew it had created in developing Loop D for RV use without any mitigation, protection or warning against a known geologic hazard.

143.    Out of an abundance of caution and in the alternative, at any point in the planning, development and management of Loop D where the Defendant, its agencies, employees or agents, acted with emergent judgment, the Plaintiffs also allege that the conduct by the Defendant described herein, in light of and in consideration of all the circumstances, shocks the conscience.

144.    The Defendant is directly liable for its own acts, through its agencies, as well as being vicariously liable for the acts of its employees and agents, who created this danger to the Roeders while acting under color of state law.

145.    As the proximate result of the Defendant's failure to protect or warn against the state-created dangers described herein, Kay Roeder, Bruce Roeder and Deborah Roeder were deprived of life, liberty and property, without due process of law and in violation of the Fourteenth Amendment of the Constitution of the United States.

146.    The Plaintiffs assert claims for all compensatory damages, including, but not limited to, the physical injuries and deaths described herein, pain and suffering, mental anguish, loss of life, loss of consortium, loss of services and contributions, medical expenses, caretaking and custodial care and property damage, including any such damages reasonably certain to be incurred in the future, in an amount to be determined by the fact-finder, plus the costs of this litigation, and all of the relief to which the Plaintiffs are entitled to by law.

147.    The personal property losses claimed by the Plaintiffs were previously provided to the Defendant in specific detail, and include but are not limited to the property losses described in paragraph 92 above.

148.    The foregoing due process violations by the Defendant also require an assessment of punitive damages in this matter, since the conduct of the Defendant, its agencies, employees and agents was committed with malice or reckless disregard for the consequences.

149.    The Plaintiffs also are entitled to the costs of suit and reasonable attorneys' fees, pursuant to the Civil Rights Act of 1964, 42 U.S.C. section 2000a-3(b), and the Civil Rights Attorney's Fee Award Act of 1976, 42 U.S.C. section 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant, United States, as follows: for general and special damages within the jurisdiction of the Court, in an amount to be proven and apportioned at trial; for damages suffered by the Estates of Esther Kay Roeder, Bruce Wayne Roeder and Deborah Busby Roeder; for damages suffered by the survivors of Esther Kay Roeder, Bruce Wayne Roeder and Deborah Busby Roeder under the Arkansas Wrongful Death Act; for punitive damages in an amount to be determined by the jury at trial; for costs of suit incurred herein; for prejudgment interest, according to proof, as well as for attorneys' fees for the claims brought pursuant to 42 U.S.C. section 1983, and for such other and further relief as the Court deems just and proper.

Respectfully Submitted:

Theresa Roeder, as the Administratrix of the Estate of Esther Kay Roeder, deceased, and on behalf of the wrongful death beneficiaries of Esther Kay Roeder; Tara Roeder, as the Administratrix of the Estate of Bruce Wayne Roeder, and on behalf of the wrongful death beneficiaries of Bruce Wayne Roeder; and Tara Roeder, Administratrix of the Estate of Deborah Busby Roeder, and on behalf of the wrongful death beneficiaries of Deborah Busby Roeder

James Freeman, Esquire
Florida Bar No: 0261971
Wilkes & McHugh, P.A.
One North Dale Mabry Highway, Suite 800
Tampa, Florida 33609
Telephone: (813) 873-0026
Facsimile: (813)286-8820      and

Melody Piazza, Esquire
Arkansas Bar No: 86108
Wilkes & McHugh, P.A.
One Information Way, Suite 300
Little Rock, Arkansas  72202
Telephone: (501) 371-9903
Facsimile: (501) 371-9905
Attorneys for Plaintiffs